# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT O. SPENCER, : | |
|     Plaintiff, : | |
| : | |
| v. : | Civ. No. 16-5841 |
| : | |
| POTTSTOWN SCHOOL DISTRICT, : | |
|     Defendant. : | |

**Diamond, J.**                                                                                                                  **February 13, 2018**

## **MEMORANDUM**

In this race discrimination action, Defendant Pottstown School District asks me to preclude Plaintiff Robert O. Spencer from using documents he purloined from Pottstown's computer system. Because the credible evidence overwhelmingly confirms Spencer's wrongdoing, I will grant the Motion and order Plaintiff to return the documents to the School District.

## **PROCEDURAL BACKGROUND**

While serving as Pottstown's Network Administrator, Plaintiff, who is African-American, filed an EEOC charge on March 8, 2016, after Richard Hug, a Caucasian, was hired to serve as Director of Technology when Plaintiff was not promoted to that position. (Am. Compl. ¶ 32, Doc. No. 13; Pl.'s Proposed Find'gs Fact and Concls. Law ¶¶ 3, 7, Doc. No. 101; Def.'s Proposed Find'gs Fact and Concls. Law ¶ 1, Doc. No. 102.) In investigating this charge, Pottstown authorized Plaintiff to search Human Resources Director Stephen Rodriguez's email account to retrieve documents that Plaintiff said supported his discrimination claim. (Mem. of Law for Def's Mot. to Prohibit 6 n.9, Doc. No. 23-1; Pl.'s Proposed Find'gs Fact and Concls. Law ¶¶ 8–13, 25; Def.'s Proposed Find'gs Fact and Concls. Law ¶¶ 4–5.) The crux of the instant dispute is the scope of that authorization.

On November 10, 2016, Plaintiff brought suit in this Court. (Compl., Doc. No. 1; Def.'s Proposed Find'gs Fact and Concls. Law ¶ 6); see also Civil Rights Act of 1964, 42 U.S.C. § 2000e. During discovery, Plaintiff produced 57 pages of documents that Pottstown believes confirm that Plaintiff had surreptitiously and improperly obtained "multiple documents from [Pottstown's computer] network." (Mem. of Law for Def's Mot. to Prohibit 2; Def.'s Proposed Find'gs Fact and Concls. Law ¶ 11.) Pottstown moves to preclude Plaintiff's use of the following eight categories of documents that Plaintiff improperly obtained:

1) Emails sent and received among Pottstown, its solicitor, and defense counsel relating to the instant action (P110–P121, P126) (Doc. No. 64);

2) An Educator Misconduct Complaint made against a former Pottstown employee and related emails and memoranda (P10, P61–P63, P106–P109);

3) "Minutes of private executive sessions of [Pottstown's] Joint Finance/Personnel Committee ('Committee') to discuss matters such as personnel and litigation—including a discussion of the candidate [Hug], and defense counsel [Levin's] discussion of [Plaintiff's] filed claim of discrimination" (P36–37, P41, P43–44, P46–47);

4) Emails written by Rodriguez and sent to himself comprised of "comments for himself to make in executive session to the Committee concerning candidate [Hug]" and "agenda and executive session items, together with a reply email from [Pottstown's] Superintendent" (P105, P123–P124);

5) A memorandum from Levin and other members of Pottstown's "Litigation Hold Team" addressing the instant litigation and resulting document and information retention requirements (P64–P66; P75–P77);

6) An email exchange between Rodriguez and the Superintendent setting out Rodriguez's

belief that Plaintiff may sue Pottstown (P125);

7) Pottstown's draft EEOC position statement prepared by counsel (P229–P232); and

8) A resume submitted to Pottstown for its Superintendent vacancy (P7–P9).

(Mem. of Law for Def's Mot. to Prohibit 2–6; Pl.'s Resp. to Def.'s Mot. 5–6, Doc. No. 29.)

Pottstown has added to this list nine additional documents that Plaintiff subsequently produced in discovery: duplicates of materials in categories 3 and 5, and three additional pages of minutes from the Finance/Personnel Committee executive sessions. (Def.'s Mot. to Prohibit, Doc. No. 23; Def.'s Letter Am'g Def's Mot. to Prohibit, Doc. No. 60 (listing P539–P540, P550–P552, P555–P557, P585–P587 as additional documents to be precluded).)

I conducted an evidentiary hearing to resolve the Parties' factual disputes respecting the scope of Plaintiff's search authorization and so determine what, if any, sanction or remedy should be ordered. (See Sept. 13, 2017 Hr'g Tr., Doc. No. 70; Nov. 14, 2017 Hr'g Tr., Doc. No. 95; Nov. 22, 2017 Hr'g Tr., Doc. No. 100.) The Parties have submitted Proposed Findings of Fact and Conclusions of Law, as well as further Responses.

## **FINDINGS OF FACT**

The evidentiary hearing before me took place over three days. After it became likely that defense counsel Michael Levin would testify, he withdrew from the case and was replaced by a lawyer from another firm. (Doc. Nos. 96–97); see also Pa. Code of Prof'l Responsibility R. 1.7, 3.7. In all, Plaintiff, Principal Matthew Moyer, and Levin testified before me. The testimony of Levin and Moyer was credible, persuasive, and corroborated by documentary evidence. I discredit almost entirely Plaintiff's ever-changing, evasive, and dishonest version of events. Having reviewed all the evidence and submissions, I make the following factual findings.

## A. Internal Investigation

Upon receiving notice of Plaintiff's EEOC charge, Pottstown, following School District policy, conducted an internal investigation of the matter. (Mem. of Law for Def's Mot. to Prohibit 6 n.9; Def.'s Proposed Find'gs Fact and Concls. Law ¶¶ 4–5.) Elementary School Principal Matthew Moyer was appointed to conduct the investigation with the assistance of Mr. Levin. (Nov. 14, 2017 Hr'g Tr. 16:8–10; Def.'s Proposed Find'gs Fact and Concls. Law ¶¶ 4–5.) Follow Pottstown's established practice, Moyer and Levin conducted transcribed interviews of Plaintiff, which took place on April 19, 2016 and May 19, 2016. (Id.; Pl.'s Proposed Find'gs Fact and Concls. Law ¶¶ 8, 9, 11, 12; see also Apr. 19, 2016 Interview Tr., Ex. A, Doc. Nos. 29-3, 29-4, 29-5, 29-6; May 19, 2016 Interview Tr., Ex. B, Doc. Nos. 29-7, 29-8, 29-9.)

During the April 19 interview, Plaintiff informed Moyer and Levin that, on February 25, 2016, while helping then-Human Resources Director Stephen Rodriguez with an email problem, Plaintiff saw, but did not copy, two emails caught in Rodriguez's inbox that Plaintiff said proved that Hug had lied to Pottstown respecting why he had left his previous job. (Sept. 13, 2017 Hr'g, Ex. D44; Sept. 13, 2017 Hr'g Tr. 71:1–4, 72:19–25; Nov. 14, 2017 Hr'g Tr. 6:17–25; Nov. 22, 2017 Hr'g Tr. 13:14–14:17; Apr. 19, 2016 Interview Tr. 55:14–56:15, 78:5–23 ("I know for a fact that Stephen Rodriguez has emails of Rich Hug asking his reference to make a false reason for his release. And I also know that Steve Rodriguez has emails of knowing that his recommendation said don't worry. I'll try to make this reference positive.").) Levin told Plaintiff: "I would like you, and I'm asking you as Counsel for the school district, to print those out." (Apr. 19, 2016 Interview Tr. 56:21-23.) Plaintiff responded that under School District policy, he could not access another employee's email account "unless appropriate persons were to tell me to"; Plaintiff requested "a full statement" of permission. (Id. at 56:24–57:1, 57:8–9;

4

Nov. 22, 2017 H'rg Tr. 9:10–23 (Moyer agrees that Plaintiff's position in the IT department did not allow him to access Rodriguez's emails).)

### B. Scope of Authorization for Plaintiff to Search Rodriguez's Email Account

The credible evidence convincingly shows that Plaintiff was given permission to conduct an extremely limited, supervised search of Rodriguez's account for the two documents that Plaintiff first mentioned on April 19. The credible evidence further shows that these two emails, which Plaintiff said impugned Hug's hiring, in fact did not. Rather, Plaintiff distorted the content of those emails to create a phony pretext for obtaining access to Rodriguez's email account and find documents he hoped to use against Pottstown.

*Initial Authorization*

Levin thought that Plaintiff would be the "best person" to locate and retrieve the two emails that he alone had seen. (Nov. 14, 2017 Hr'g Tr. 40:24–41:7.) Moyer would supervise the search, thus ensuring that Plaintiff could retrieve only those two emails. (Nov. 22, 2017 Hr'g Tr. 8.) The investigative interview transcript reflects these restrictions:

> [Plaintiff]: Now, some of the emails might have been deleted, and I hope that has not occurred, but I'm also a forensic specialist, so in the event that emails have been accidentally deleted, I'm pretty sure I can get them back.
> [Levin]: We would be most appreciative to have you do that work, and you could work directly with Matt [Moyer] –
> [Plaintiff]: I'll let him watch over my shoulder.
> [Levin]: That may not be a bad idea for you and for Matt and I, and I would ask you one other thing, that when you're doing that to take a chronological note, notation of exactly what you're doing for your records and our records, so that there's a record of what you did to retrieve those.
> [Plaintiff]: Understood.
> [Levin]: Think that's reasonable?
> [Plaintiff]: Yes.

(Apr. 19, 2016 Interview Tr. 57:16–58:14.) At the conclusion of the interview, Levin stated: "We will get you an email that will . . . give you authorization to work with Matt [Moyer] to get

5

those emails that you're going to be searching for." (Id. at 169:4–9.)

Both Levin's and Moyer's testimony before me reflect this sequence of events and Plaintiff's limited authorization to retrieve the two emails Plaintiff purportedly had seen on February 25. (Nov. 14, 2017 Hr'g Tr. 24:15–19; Nov. 22, 2017 Hr'g Tr. 6:5–7, 7:21–25; Apr. 19, 2016 Interview Tr. at 57:10–15.) Consistent with that authorization, on April 20, 2016, Moyer sent the following email to Plaintiff:

> You are hereby given authority to retrieve the emails that were generally described by you and print them out for me. We agreed that you would do the work in my presence and would prepare a record of exactly what you are doing to retrieve those emails. A copy of the record will be given to me and you may keep a copy of the record. I will call you to schedule a date and time that we can accomplish this.

(Mem. of Law for Def's Mot. to Prohibit 6–7; Nov. 14, 2017 Hr'g, Ex. D1.) Plaintiff acknowledged before me that he received this email, and agreed that it allowed him to conduct the search only with Moyer present, and to retrieve only the two emails. (Sept. 13, 2017 Hr'g Tr. 76:14–23; 74:23–75:6.)

### *The Second Interview*

On April 27, 2016, Plaintiff and Moyer met as planned. Plaintiff described this search during his second investigative interview:

> You [Levin] gave me the approval to investigate emails with Matt Moyer, so essentially what I did was I waited until Matt and myself had an opportunity to meet in his office. The email that you sent me, the email that Matt Moyer sent me stated that I had approval to look in the email account when Matt Moyer was with me. And that's what I did.

(May 19, 2016 Interview Tr. 44:10-16.) During the April 27 search, Plaintiff printed out the two emails he had seen on February 25, neither of which impugned Hug's hiring or helped Plaintiff. (See Mem. of Law for Def's Mot. to Prohibit 7; Def's Mot. to Prohibit, Ex. 5 at 73–75; Sept. 13, 2017 Hr'g Tr. 78:6–21; Nov. 22, 2017 Hr'g Tr. 11:25–12:7, 14:18–25, 15: 1–9; May 19, 2016

6

Interview Tr. 18, 27.)

Apparently realizing that Pottstown would thus understand that on April 19 he had distorted the subsequently retrieved emails' content to the point of fabrication, Plaintiff complained during the May 19 interview that he was unable to find "additional emails" he had also seen on February 25. (May 19, 2016 Interview Tr. 8:22–9:25.) Plaintiff suggested that those emails must have been "deleted and hidden or moved." (Id. at 26:13–18.) Plaintiff had not mentioned these "additional emails" until the second interview, when he acknowledged that "there's no way I can prove anything that I say concerning [the additional emails]." (Id.) Even more remarkably, when asked about the contents of those emails—which Plaintiff alone purportedly had seen on February 25—Plaintiff responded, "[a]t this time, I can't recall [any] of the data from those emails." (Id. at 41:13–17.) Not surprisingly, no trace of those emails (whose very existence was conjured by Plaintiff) has ever been found.

At the conclusion of the May 19 interview, the Parties discussed wrapping up the investigation, suggesting that Pottstown would conduct a forensic examination of the account:

> [Levin]: . . . It will take some time for us to do the [computer] forensics and figure out how those forensics will be done to capture those emails.
> [Plaintiff]: You're talking about you[] or me?
> [Levin]: What?
> [Plaintiff]: Are you talking about you doing it or me doing it?
> [Levin]: The school district's going to do it. We may have you involved in some way. . . . Do you want us to do that as a part of our investigation, search for those emails that you claim have been permanently deleted, moved or hidden, or do you want us not to do that in order for Mr. Moyer to be able to get his report to you next week? It's going to take more time. That's all.

(May 19, 2016 Interview Tr. 119:12-120:1.)

*Plaintiff's Deposition*

At his April 2017 deposition, Plaintiff was extraordinarily evasive, refusing to answer even the simplest questions respecting his search of Rodriguez's email account. For example, he

7

was repeatedly asked about the "additional emails" he alleged had been deleted:

> [Question]: You cannot identify anything that has been deleted in the sense that they can no longer be found?
> [Spencer]: There is a process that you can utilize to attempt to recover emails that have been deleted depending on the method that was used to delete them.
> [Question]: That's very nice. Now would you answer my question.
> [Spencer]: I ---.
> [Question]: You cannot identify a single document that has been deleted in the sense that it can no longer be found, can you?
> [Spencer]: There is a methodology to find documents that --- maybe you should --- do me this favor, because I feel that you're getting frustrated, can you please ask me the question in a different manner? So I can actually respond the way you desire.
> [Question]: Sure. Can you --- you know what a document is. Right?
> [Spencer]: Define.
> [Question]: You don't know what a document is?
> [Spencer]: No. I want to make sure we're on the same page.

(Apr. 20, 2017 Spencer Dep. 34:11–35:16, Doc. No. 23-5.) As the inquiry was repeated, Plaintiff became even more evasive and incomprehensible:

> [Question]: Can you identify a document that has been deleted and is no longer recoverable?
> [Spencer]: Can you please give me --- oh, a, a the or whose. You're not --- see, you're asking me about a process. And I'm going to answer. I just need to have the question.
> [Question]: Don't change the question, sir. I want you to tell me any document that is no longer available?
> [Spencer]: There could be hundreds of thousands of documents. I don't know what you mean.

(Id. at 37:11–25; see also id. at 38:3–39:16, 87:19–89:21, 91:19–94:22, 95:6–96:19, 99:9–101:13.)

### *Plaintiff's Evidentiary Hearing Testimony*

When testifying before me, Plaintiff contradicted his transcribed statements and his deposition testimony. Remarkably, he even contradicted himself over the two days he testified. Plaintiff told me that his search authorization was initially quite limited (as Levin and Moyer testified), but was subsequently expanded in an email authored by Levin. (Sept. 13, 2017 Hr'g

8

Tr. 79: 17–24, 80:18–81:1, 82:12–18.) Plaintiff has produced no such email, which Levin credibly testified he never wrote or sent. (Nov. 14, 2017 Hr'g Tr. 27:2–28:12.) Yet, during the hearing's second day, Plaintiff testified that during the April 19 interview he was given unrestricted authorization to search Rodriguez's emails without Moyer being present. (Nov. 14, 2017 Hr'g Tr. 7:5–12 (he was instructed to "[f]ind the emails and show us how to do it"), 8:6–9 (he was told "[y]ou have our authority to copy, save, print emails, give them to anyone, including the EEOC, for remedy," and "[a]lso show Matt Moyer the emails you refer to, concerning the emails you saw"), 14:21–24 ("I was never given any scope to search for, other—there was no limitations given to me, concerning a search.").)

During both days, Plaintiff was continually evasive and misleading in answering any questions related to his authorization to search. (Sept. 13, 2017 Hr'g Tr. 79:9–81:13; Nov. 14, 2017 Hr'g Tr. 5:11–6:9, 6:19–7:12, 7:17–8:9, 8:16–9:15.)

*Plaintiff's Credibility*

It is difficult to keep track of Plaintiff's innumerable contradictions, evasions, and outright falsehoods, which primarily cover two subjects: 1) the two emails Plaintiff purportedly saw on February 25 that impugned Hug's hiring and thus gave rise to Plaintiff's search of Rodriguez's email account; and 2) the permissible scope of that search.

Although Plaintiff initially suggested that he wished to retrieve two incriminating emails from Rodriguez's account, during the May 19 interview Plaintiff agreed that those emails were not incriminating, and suggested for the first time that Pottstown had "deleted" or "hidden" "additional" documents. Yet, during that same interview, Plaintiff refused to identify these documents or describe their contents.

Plaintiff gave similarly impossible testimony respecting the nature of the email search he

9

was authorized to conduct. As I have found, Plaintiff initially confirmed his very limited authority to search Rodriguez's emails. (Apr. 19, 2016 Interview Tr. 57:16–58:14; May 19, 2016 Interview Tr. 44:10–16.) During his deposition a year later, however, Plaintiff testified that Levin "told [him] to do an investigation and to locate the emails and then show Matt Moyer how [he] did it." (Spencer Dep. 21:20–23, 22:11–13, 24:15–22, 25:3–7.) Yet, when he testified before me, Plaintiff first said that Levin had by email expanded the search authorization; during his subsequent appearance, he testified that during the April 19 interview he was given unrestricted authority to search.

I credit the testimony of Levin and Moyer—which is consistent with all the documentary evidence—that Plaintiff was given permission to search only for two emails purportedly in Rodriguez's email account and only in the presence of Moyer, and that Plaintiff understood these restrictions. I discredit Plaintiff's various versions of these events to the extent they are inconsistent with the testimony of Levin and Moyer.

It is apparent that on February 25 Plaintiff never saw any emails that impugned Hug. Rather, Plaintiff distorted the contents of the Rodriguez emails he saw on February 25 and subsequently retrieved (under Moyer's supervision). He did so as a pretext for gaining what he hoped would be unfettered access to Rodriguez's account where Plaintiff hoped to find damaging School District documents. Plaintiff then intentionally acted well outside the restricted search authority he was given.

**C. Plaintiff's Search and Imaging of the Email Account**

During his deposition, Plaintiff admitted that without Moyer present, Plaintiff conducted a complete search of Rodriguez's email account almost immediately after the April 19 interview; he began creating "static images," or backups, of that account, the entire email server, and

Plaintiff's own computer. (Spencer Dep. at 23:7–24:12, 52:3–13, 90:15–6, 96:21–99:9, 115:2–116:6.) Plaintiff also admitted that two hours after his April 27, 2016 meeting with Moyer, Plaintiff again searched through Rodriguez's complete email account, again without Moyer present. (See Spencer Dep. 27:16–20, 28:19–24, 29:18–20 ("Literally I did searches on anything that Steve Rodriguez sent, that had been moved from the inbox."), 52:14–18.)

Although in his testimony before me, Plaintiff varied some minor details, he confirmed that, without Moyer present, Plaintiff conducted unlimited searches of Rodriguez's email account. (Compare Nov. 14, 2017 Hr'g Tr. 9:7–15, and 10:5–11, with Spencer Dep. at 23:7–24:12, 52:3–13, 90:15–6, 96:21–99:9, and 115:2–116:6.)

Contrary to Plaintiff's false, contradictory testimony, he was not authorized to conduct these unrestricted searches, and certainly was never given permission to "image" Rodriguez's account.

## CONCLUSIONS OF LAW

"[T]he use of information obtained by a party independent of the discovery process" is not regulated by the Procedural Rules. Fayemi v. Hambrecht & Quist, Inc., 174 F.R.D. 319, 325 (S.D.N.Y. 1997); see also Fed. R. Civ. P. 26(c). The Court may, however, exercise its "inherent equitable power . . . to prevent abuses, oppression, and injustices." Fayemi, 174 F.R.D. at 324 (quoting Gumbel v. Pitkin, 124 U.S. 131, 1444 (1888)); see also In re Shell Oil Refinery, 143 F.R.D. 105, 108 (E.D. La. 1992) (a party "circumvent[ing] the discovery process" by surreptitiously obtaining proprietary documents may be sanctioned by a court using its inherent power); Garrett v. Nat'l R. Passenger Corp., No. 89-8326, 1990 U.S. Dist. LEXIS 10868, at *7 (E.D. Pa. Aug. 14, 1990) (party precluded from using statement, information, or evidence retrieved by the party's misconduct). That authority includes precluding a party's use of

11

improperly obtained evidence. Fayemi, 174 F.R.D. at 324, cited with approval in George v. Indus. Maint. Corp., 305 F. Supp. 2d 537, 539 (D.V.I. 2002); Perna v. Electronic Data Sys., Corp., 916 F. Supp. 388, 403 (D.N.J. 1995).

The Court may also use this inherent power to compel the return of improperly obtained evidence. Bell v. Lockheed Martin Corp., No. 08-6292, 2010 WL 11450407, at *4 (D.N.J. June 30, 2010). In determining what, if any, remedy or sanction is appropriate, the Court should consider "the severity of the wrongdoing and the prejudice to the adversary." Fayemi, 174 F.R.D. at 325.

### A. Severity of Wrongdoing

In *Fayemi*, the plaintiff obtained "highly confidential" documents relevant to his employment discrimination claims by sneaking into his former supervisor's office on a Sunday morning and printing them from his computer. Fayemi, 174 F.R.D. at 322. The court found that Fayemi's "suggestion that he had standing permission to enter his former supervisor's office and access the computer [was] unfounded," and that his "conduct was sufficiently serious to warrant" an order of preclusion. Id. at 325; see also 6 James Wm. Moore et al., Moore's Federal Practice - Civil § 26.06 (2017) ("[T]he court may resort to its inherent sanctioning power . . . when a party obtains information outside the discovery process, and does so improperly.").

In the instant case, Plaintiff's wrongdoing was similarly severe. Although Plaintiff urges that there exists a "genuine dispute over the level of access and scope afforded to Plaintiff" to conduct email searches, I have resolved this dispute, discrediting the great bulk of Plaintiff's testimony. (Pl.'s Resp. to Def.'s Mot. 3.) Plaintiff well understood that he could retrieve only two emails from Rodriguez's account and only with Moyer present. (April 19, 2016 Interview Tr. at 56:24–57:1, 57:8–9; May 19, 2016 Interview Tr. 44:10–16.) Using the phony pretext he

had created, Plaintiff acted well outside that authority.

   **B. Prejudice**

Plaintiff argues that his actions did not prejudice Pottstown because the documents he pilfered were "fairly encompassed in Plaintiff's discovery requests." (Pl.'s Resp. to Def.'s Mot. 6.) This is simply wrong. Few, if any, of the disputed documents would have been available to Plaintiff through legitimate discovery. The documents in categories 1, 3, 5, 6 and 7 (set out on pages 2–3) are attorney-client privileged or protected by the work-product doctrine and so would have been properly withheld from Plaintiff. Categories 3 and 4 are protected from disclosure by the Pennsylvania Sunshine Act. 14 Pa. Const. Stat. § 707–08. Categories 2 and 8 have nothing to do with this case and so were not discoverable. Category 2 is further protected from disclosure by the Educator Misconduct Act. 24 Pa. Cons. Stat. § 2070.17b. Plaintiff nonetheless was able, through his wrongful actions, to access these documents, and now seeks to use them against Pottstown. In these circumstances, Pottstown has certainly suffered prejudice. See also Bell v. Lockheed Martin Corp., No. 08-6297, 2010 WL 11450407, at *4 (D.N.J. June 30, 2010) (defendant was prejudiced by the plaintiff wrongfully obtaining material outside the discovery process which she intended to use in litigation).

Plaintiff also argues that Pottstown suffered no prejudice because any privilege or protection attaching to the disputed documents was waived when the School District authorized Plaintiff to search Rodriguez's email account. (Pl.'s Resp. to Def.'s Mot. 7–8.) Once again, this is simply wrong. Pottstown seeks to preclude Plaintiff's use of the documents he stole, not the two emails he permissibly retrieved under Moyer's supervision. (Mem. of Law for Def's Mot. to Prohibit 6, 13–14.)

As I have found, Pottstown allowed Plaintiff, with Moyer present, to retrieve only the

13

two documents he had purportedly seen on February 25. (See Nov. 14, 2017 Hr'g, Ex. D1.) In granting Plaintiff this restricted authority, Pottstown did not give permission to image Rodriguez's account or to loot wholesale Rodriguez's emails and certainly did not waive the protections attached to those emails. See also Herrera v. Clipper Grp., L.P., No. 97-560, 1998 U.S. Dist. LEXIS 6454, at *8 (S.D.N.Y May 6, 1998) (plaintiff was not given implied permission to acquire documents purely because she had access to them as "[t]he confidentiality of a document is not waived by its owner's failure to keep it under lock and key.").

Moreover, even if Pottstown had waived any privilege or protection—which I very much doubt—Plaintiff's remedy was to contest before me Pottstown's privilege or protection claim, not to resort to "self help" and pilfer the documents themselves. See Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991) (court has the inherent authority to impose sanctions for "conduct which abuses the judicial process").

In these circumstances, Plaintiff's wrongful actions obviously prejudiced Pottstown.

### C. Unclean Hands

Plaintiff suggests that because Pottstown improperly failed to produce the disputed documents during discovery, preclusion is unwarranted. See Karpenko v. Leendertz, 619 F.3d 259, 265 (3d Cir. 2010) (the unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [other party]") (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)); see also Fayemi v. Hambrecht & Quist, Inc., 174 F.R.D. 319, 326 (S.D.N.Y. 1997). As I have discussed, however, all the disputed documents were protected from disclosure, and Pottstown did not waive those protections.

Moreover, it is by no means clear that Plaintiff even sought the production of the disputed

documents. Indeed, Plaintiff argues only that the documents "*may* have been encompassed" in his discovery demands. (Pl.'s Resp. to Def.'s Mot. 5 (emphasis added).) Plaintiff simply refers by number to his document production requests and does not indicate what disputed documents were encompassed by each request, or how Pottstown responded to these requests. See Romero v. Allstate Ins. Co., 158 F. Supp. 3d 369, 378 (E.D. Pa. 2016) (a party seeking to invoke the unclean hands doctrine "must introduce 'clear, convincing evidence of 'egregious' misconduct'") (quoting Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir. 2004)).

In these circumstances, Pottstown's hands can hardly be described as "unclean." Compare George v. Indus. Maint. Corp., 305 F. Supp. 2d 537, 540–41 (D.V.I. 2002) (unclean hands doctrine barred preclusion when the defendant had failed to produce the disputed documents after they were explicitly requested); Fayemi, 174 F.R.D at 326 (unclean hands doctrine barred preclusion when the defendant had destroyed the evidence sought in discovery).

In sum, because Plaintiff has not shown that Pottstown had "unclean hands," the equitable relief the School District seeks remains available.

## CONCLUSION

In sum, the evidence shows that after creating a dishonest pretext, Plaintiff Robert O. Spencer effectively stole from Pottstown a cache of otherwise undiscoverable documents that he now seeks to use in this litigation. The evidence further shows that Plaintiff has repeatedly lied about his actions. I will grant Pottstown's Motion to Preclude (Doc. No. 23), prohibit Plaintiff from using the documents, and direct their return to the School District. I will determine before trial whether to impose any additional sanctions against Plaintiff for his misconduct and false testimony. See Chambers, 501 U.S. at 44–45 (the inherent power to sanction conduct "which

15

abuses the judicial process" includes the power to award attorney's fees); <u>Perna v. Electronic Data Sys., Corp.</u>, 916 F. Supp. 388, 403 (D.N.J. 1995) (party sanctioned for misconduct with an adverse jury instruction).

An appropriate Order follows.

*/s/ Paul S. Diamond*

February 13, 2018                                                    Paul S. Diamond, J.